UNITED STATES BANKRUPTCY COURT          NOT FOR PUBLICATION
WESTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------          NO PRECEDENTIAL EFFECT
In re
    ELN Professional Employers Group          Case No.04-19312 MJK
    Tax ID: 16-1537179

                                  Debtor(s)
-------------------------------------------------------------------
John H. Ring, III

                                  Plaintiff(s)

    -vs-
                                      AP No. 05-1339 MJK

ELN Professional Employers Group
Center Street Smokehouse, Inc.
Cregg Paul
Bayview Loan Servicing LLC

                                  Defendant(s)
-------------------------------------------------------------------

John James Keenan, Esq.
Law Offices of John J. Keenan
3123 Cloverbank Road
Hamburg, NY   14075

ATTORNEY FOR PLAINTIFF


Mehmet Kirk Okay, Esq.
Okay Law Firm
546 East Main Street
PO Box 622
Batavia, NY 14021-0622

ATTORNEY FOR DEFENDANTS
ELN Professional Employers Group,
Center Street Smokehouse, Inc. and
Cregg Paul

## DECISION AND ORDER[1]

This Chapter 7 case and Adversary Proceeding are over fifteen years old because (in large part) of many years-long investigations by administrative agencies and law enforcement agencies that are almost totally unrelated to the matter here in dispute.[2] Here the question is whether the Chapter 7 estate of ELN is entitled to the return of title to certain real estate, or a money judgment for the value of that real estate, under applicable state and federal fraudulent transfer statutes.

This is a decision after trial. The trial consisted only of documents and the testimony of the principal of the debtor under subpoena, and occurred on November 19, 2018, and was expected to be continued at a later date. But after more than a year elapsed, a decision was made by the parties that there would be no continuation of the trial. That was reported to the Court on January 14, 2020. And so the matter was submitted to the Court on the basis of the testimony of Mr. Cregg Paul (the principal of the debtor) and some documents admitted into evidence. It was not until March 20, 2020 that the transcript was obtained.

The fact that this matter was not the subject of thorough advocacy is the first reason that this Decision shall have no precedential value. The second is addressed below.

---

[1] For reasons to be set forth below, this Decision shall have no precedential effect.

[2] The investigations resulted in a criminal tax conviction/plea as to the Debtor's principal, who was the sole witness here at trial. The Court finds his testimony as to the matters here to be credible.

The following constitutes the Court's Rule 52 Findings of Fact and Rulings of Law.

In February 2001, the Debtor bought a parcel of real estate from the City of Batavia. The price was $5,000.00 in cash, and it is not clear who paid it.

The Debtor was profitable from year to year before that, in the business of payroll management and consulting. Because of that creditworthiness, the Debtor was able to borrow money to renovate the parcel that it bought, it being the intention of the Debtor's principal, Mr. Paul, to open a restaurant in that location. Together with other investors, Mr. Paul formed a business entity by the name of Center Street Smokehouse, Inc. However, as a newco, Center Street Smokehouse, Inc. could not obtain financing to renovate the building into what became known as Center Street Smokehouse. Thus, ELN borrowed $200,000.00 from the Bank of Castile to begin the renovation of the building.

Importantly, it is the unchallenged testimony of Mr. Paul that payment of the mortgage was made entirely by Center Street Smokehouse, Inc., not by ELN.

There came a time when the State of New York asserted a very large claim against ELN arising out of an audit by the Department of Labor in connection with unemployment taxes and an experience rating modification. (It was unrelated to the matter at hand.) That was back in January of 2000. It is the testimony of Mr. Paul that the New York State claim was the only unpaid unsecured debt of ELN at the time that the claim was asserted. ELN challenged that audit.

Mr. Paul's attention was on the construction issues surrounding, and launching, of the restaurant venture. While he was so distracted, according to his testimony, one of his key employees in the payroll services business began to steal customers from ELN, eventually opening his own competing business. Additionally, he testified, another of his key employees was embezzling money from ELN, he testified. The combination of these events led to a point at which (he said) ELN had "lost its asset base." Mr. Paul's partners in the Smokehouse wanted title to the Smokehouse building transferred to the corporate entity of the Smokehouse. Thus, Mr. Paul caused the title to pass to the Smokehouse entity on January 15, 2004, for no consideration. That is the transfer at issue in this Adversary Proceeding, as ELN filed a petition seeking relief under Chapter 11 of the Bankruptcy Code on December 22, 2004, less than a year after the transfer.[3] By the time of the transfer, the Smokehouse was able to borrow money from an entity here called "Bayview" and Smokehouse paid off the ELN debt to the Bank of Castile. (Bayview was subsequently added as a defendant in this Adversary Proceeding and served with the Amended Summons and Complaint, but has not appeared here.)

The second reason that this Decision shall have no precedential effect is the total failure of proof as to the value of the property at the time of transfer from ELN. The Trustee's evidence to the effect that the property had substantial value in excess of liens at the time of the transfer consists solely of what the Trustee calls an "appraisal". The

---

[3] This case was converted to Chapter 7 on May 18, 2005 and this action was filed by the Chapter 7 Trustee approximately six months thereafter, seeking to avoid the transfer or to recover the value of the property conveyed

Court finds that it is not an "appraisal". Rather it is (by that document's own description) a "Letter of Opinion/Preliminary Study", presumably in connection with Mr. Paul's effort to have Center Street Smokehouse borrow to continue work on the building based on his plans regarding the completion of the buildout of the restaurant, and the business plan for the restaurant. It was "Made For: Center Street Smokehouse, Inc." It placed an anticipated value on the property of $515,000.00.

In material part, it begins: "This preliminary study consisted of an inspection of the property with Mr. Paul on March 10, 2005, a review of municipal records, a review of the June 29, 2001 Limited Summary Appraisal…and a review of data in the appraiser's files." The 2001 "appraisal" was not submitted to the Court.

After that, the clear focus of the study is not on what the property was worth on March 10, 2005 if the renovation efforts were to cease, but rather on what the prospects were for Center Street (as a borrower) if its build-out plans and plans for furniture and furnishings were fulfilled. This interpretation is made inescapable by language such as the following statements on page 7 of the report, especially in light of this statement on page 9 of the report, "It should be clearly understood that an appraisal report, per se, has not been made of the above referenced property." :

> "The current owner is gutting and renovating the property."
>
> "The front vestibule will lead into the bar area."
>
> "The full service bar will seat 11±."

> "There will be four high top tables, four high top booths and a waiting area."
>
> "[T]here will be seven high top booths and four tables" on the second floor.
>
> "The first floor center portion will have eight high top booths."
>
> "There will also be a six-piece Men's Room and a six-piece Ladies Room with a lounge area."
>
> "The second story center portion will have ten tables."
>
> "The first floor rear will be the fully sprinklered kitchen. This will have a double stainless steel sink, an 8x10 walk-in cooler and 5x8 walk-in freezer."
>
> "All hardwood floors are to be refinished."
>
> "There will be a handicapped entry on the south portion of the building."

Such statements are in contrast to page 8 of the report, which recites what "has" been done since the June 29, 2001 "appraisal".

The report concludes, "Based upon this preliminary study, it is the appraiser's opinion that if an appraisal were made, the final market estimate would probably be in the range of $500,000 to $530,000 and most likely at midrange or $515,000. It should be clearly understood that the range of value approximated herein is subject to adjustment upon completion of an appraisal." p. 9.

The Trustee offers no other evidence of the value of the property at the time of the transfer.

This writer has been of the view, for nearly 30 years on the Bench, that if one chooses a form of record ownership such as title to real estate or a motor vehicle, one cannot impeach that choice when the filing of a bankruptcy petition has placed the matter at issue.  For example, in *Wittmeyer*, 311 B.R. 137 (Bankr. W.D.N.Y. 2004), the debtor's ex-husband claimed that a Harley-Davidson motorcycle to which the debtor held title, was really all his, despite the fact that they jointly made the decision (while married) that she should own the cycle for insurance and creditworthiness reasons.

In *Lorenzo*, 340 B.R. 450 (Bankr. W.D.N.Y. 2006), the debtor transferred thousands of dollars (from proceeds of sale of his house) to his siblings, on the eve of bankruptcy.  He claimed that although he was the sole owner of the house (which had been their parents' home), it was always intended by the family that all the siblings really "owned" the house in equal shares.

*In re Moorhouse*, 487 B.R. 151 (Bankr. W.D.N.Y. 2013) implicated a variation on the theme.  Relatives of the debtor held a mortgage on the debtor's home, but they chose not to record it until after the preference period began.  They waived the protection they would have had if they had filed the mortgage in a timely fashion.

In a business case, *In re Robert J. Bradley, Sr. (Lakeland Health Care Center, Inc. vs. Douglas Cook)*, A.P. No. 96-1299 (Bankr. W.D.N.Y. 1998), this Court was asked to

interpret the Orders by which it approved the transfer of a Florida nursing home from the debtor to one "Omega".   There was a dispute between the new operators and the State of Florida regarding whether or not the transaction that this Court approved constituted a "sale" to Omega (and then a lease to the Debtor's son's entity "Lakeland"), or a sale to the son, financed by Omega.   The documents approved by the Court specifically stated that it was a sale to Omega and a "true lease" to Lakeland, and that Lakeland would take "no position to the contrary".   Lakeland argued that the Court should determine that the intent of the transaction was for financing purposes and disregard the fact that the recorded title to the property was in favor of Omega.   This writer ruled that an innocent third party (State of Florida Agency for Health Care Administration) should not be bound by the supposed intentions of the contracting parties who elected a record form for their transaction that might appear to be at odds with their intentions.

In each of these cases and many others, a choice regarding the public record (what the public record would or would not disclose) was not permitted to be impeached by one who participated in the choice, at the expense of a debtor's creditors.

Today's decision might seem to fly in the face of that judicial philosophy.   But the <u>choice</u> by the parties here to abandon further advocacy left Mr. Paul's testimony unchallenged.   That compels this finding that there is no evidence that any improvement of the property prior to the transfer on January 15, 2004, or after, came at the expense of ELN.

## CONCLUSION

The Court rules that the Trustee has failed to carry his burden of proof that the Debtor's estate was in any way diminished by the transfer.

The Complaint is dismissed as to the Defendants who filed Answers.[4]  The parties are to bear their own costs.

Dated: July 1, 2020
         Buffalo, NY

s/Michael J. Kaplan<br>U.S.B.J.

---

[4] Bayview Loan Servicing did not file an Answer, but there has been no application seeking a default, or otherwise.